IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

IN RE: MEYER'S BAKERIES, INC.,                              CASE NO. 4:05-bk-70837M
                   DEBTOR                                                                  CHAPTER 7

RICHARD L. COX, TRUSTEE                                             PLAINTIFF

VS.                             AP NO. 4:07-ap-07289

INTERSTATE PACKAGING GROUP, INC.                               DEFENDANT

MEMORANDUM OPINION

On February 6, 2005, Meyer's Bakeries, Inc. (Meyer's) filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. On March 23, 2006, the case was converted to Chapter 7, and Richard L. Cox (Trustee) was appointed Trustee.

On July 18, 2007, the Trustee filed this adversary proceeding against Interstate Packaging Group, Inc. (Interstate) to recover eight pre-petition transfers totaling $58,296.63 as preferential transfers pursuant to 11 U.S.C. § 547 (2005).[1] Interstate filed a timely answer denying the Trustee's allegations in general and raising the affirmative defense of ordinary course of business and new value as provided in 11 U.S.C. § 547(c). Trial of the above-captioned matter was held in Texarkana, Arkansas, on August 6, 2008, after which the matter was taken under advisement.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

---

[1] This section was amended by the provisions of BAPCPA, Public Law No. 109-9, Section 409, but the amendments apply to cases filed after October 17, 2005. This case was filed before October 17, 2005, therefore, the amendments do not apply.

The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTS

Interstate is a distributor of packaging materials and equipment located in Tempe, Arizona. (Tr. at 45.)  Interstate provided packaging materials to Meyer's from 1985 until around 1992 or 1993, and then began providing packaging materials again in 2003 until 2005. (Tr. at 47.)  Specifically, Interstate provided Meyer's with printed poly bags, stretch film, tapes, a type of film to cover an energy bar, and polythene bags. (Tr. at 51.)  At the time Meyer's filed for bankruptcy in February of 2005, Meyer's liabilities exceeded its assets by at least four million dollars.  (Plaintiff's Ex. 9, Tr. at 19-20.)

The ninety-day preference period ran from November 8, 2004 through February 5, 2005, and included eight transfers totaling $58,296.63.  From December 1, 2003, until the beginning of the preference period, Meyer's paid 38 invoices to Interstate on an average of 70.2 days after the date of the invoice.  (Defendant's Ex. 2.)  During the preference period, Meyer's paid 16 invoices on an average of 71.5 days after the invoice.  (Defendant's Ex. 2.)  Nothing was changed in terms of how Interstate did business with Meyer's during the preference period.  (Tr. at 68.)

Interstate sends out all of its invoices with a preprinted term of  "net 30 days." (Tr. at 48.)  Very few, if any, of Interstate's customers pay within the 30 days unless they are cash customers. (Tr. at 49.)   The number of days that can go by before any action will be taken depends on the customer.  (Tr. at 81 and 84.)  Interstate's common practice is just to print "net 30" and then so long as it doesn't get beyond 60, 70, or 80 days, depending on the customer, there is no problem.  (Tr. at 83-84.)  Collection efforts don't usually begin until about 180 days after receipt of the invoice.  (Tr. at 82.)  Interstate typically allows more profitable customers like Meyer's to take longer to pay their invoices.

2

(Tr. at 65.)  Meyer's typically paid within the 60 to 80 day range.  (Tr. at 49.)  It was not unusual for Meyer's to pay multiple invoices with a single check. (Defendant's Ex. 2.)

Bruce Combe

Mr. Combe is the president and owner of Interstate Packaging.  (Tr. at 45.)  He was previously a purchaser/buyer of packaging materials for Food for Health Company.  (Tr. at 51.)  He testified that many of his customers pay multiple invoices with a single check and that he often pays his suppliers for multiple invoices with a single check.  (Tr. at 53.)  He further stated, based on the three companies he is personally involved in, it is typical in the packaging industry to allow multiple invoices to be paid with a single check.  (Tr. at 71-72, 79.)

Interstate has other customers besides Meyer's that pay within the 60 to 80 days after receipt of the invoice.  (Tr. at 55.)  According to Mr. Combe it is typical in the packaging industry to allow more profitable customers to take longer to pay invoices.  (Tr. at 65-66.)  Mr. Combe considered Meyer's one of Interstate's more profitable customers. (Tr. at 76.)

John Meredith

Mr. Meredith is the executive vice president and general manager of SPR Packaging in Rockwall, Texas.  (Tr. at 87.)  Mr. Meredith started in 1965 at St. Regis Flexible Packaging holding three different positions, from there he went to Paramount Packaging as plant manager in Tennessee and then became president of production in Florida.  (Tr. at 87.)  In Puerto Rico he was vice president of production of three plants. (Tr. at 87.)  He also worked at Arrow Industries until he left to start SPR Packaging.  (Tr. at 87.)  In total, Mr. Meredith states he worked at eight or nine different packaging companies.  (Tr. at 87.)

According to Mr. Meredith, customers rarely pay within 30 days.  (Tr. at 94.)  He testified that

it is common for customers to pay 50 to 80 days after receiving the invoice. (Tr. at 94.) He further stated that in the packaging industry the payment terms often depend on how big the customer is and how profitable they are. (Tr. at 96.) Mr. Meredith stated that based on these parties and how the industry works, the payments made by Meyer's during the preference period were made in the ordinary course of business. (Tr. at 96.) He stated that, "I've had 60 to 80 day terms or payments by many, many customers." (Tr. at 97.) He also explained that it is customary in the industry to make payments of multiple invoices in one check because it is cheaper to do so. (Tr. at 97.)

Keith Crass

The Trustee called Mr. Crass, a Certified Public Accountant as an expert witness. Mr. Crass testified based upon a publication titled the Almanac of Business and Industrial Financial Ratios of 2008. This publication contains a list for the time it takes to collect accounts receivables for different industries in the United States based on a code. (Tr. at 110.) The code Mr. Crass selected was Miscellaneous Nondurable Goods, which is a different code than the one used by Interstate when they report to the Internal Revenue Service, but the closest category he could find in the manual. (Tr. at 114.) Mr. Crass testified, based on the classification of Nondurable Goods, the industry standard is an average of 36.87 days to collect on an invoice. (Tr. at 120.) Mr. Crass admitted that a large part of Interstate's business was shipping durable goods, but only nondurable goods were sold to Meyer's. (Tr. at 128 & 153.) Mr. Crass also admitted that what constituted normal business terms often depended on each sale, the size of the buyer, and the size of the transaction. (Tr. at 150-151.) Mr. Crass stated that the amount of invoices paid with a single check nearly tripled during the preference period as opposed to the pre-preference period. (Tr. at 124.)

DISCUSSION

The trustee has the burden to prove the transfers were preferential and Interstate has the burden of proving the nonaviodability of the transfers. 11 U.S.C. § 547(g). The trustee must prove the transfers were: (1) to a creditor; (2) for an antecedent debt; (3) made when the debtor was insolvent; (4) made within 90 days before filing the petition; and (5) the transfers enabled Interstate to receive more than it would have in a Chapter 7 if the transfers had not been made. 11 U.S.C. § 547(b). Meyer's is presumed to be insolvent during the 90-day preference period. 11 U.S.C. § 547(f).

Interstate asserts, among other defenses, that the transfers were made in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2). A defendant asserting the provisions of Section 547(c)(2) has the burden of proof to establish the applicability of this section by a preponderance. In re Gateway Pacific Corp., 153 F.3d at 917; Jones v. United Savings and Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.), 9 F.3d 680, 682 (8th Cir. 1993). The ordinary course of business defense requires Interstate to prove that the payments to it were: (1) payment of a debt incurred by Meyer's in the ordinary course of business of Meyer's and Interstate; (2) made in the ordinary course of business as between Meyer's and Interstate; and (3) made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(2005); Official Plan Committee v. Expeditors International of Washington, Inc. (In re Gateway Pacific Corp.), 153 F.3d 915, 917 (8th Cir. 1998); Bridge Information Systems, Inc. v. Merisel Americas, Inc. & MOCA (In re Bridge Information Systems, Inc.), 383 B.R. 139, 149 (Bankr. E.D. Mo. 2008).

The second element of Section 547(c)(2) requires the creditor to demonstrate "some consistency with other business transactions between the debtor and the creditor." Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497-498 (8th Cir. 1991)(citations omitted). Factors to consider regarding the prior course of dealings between the parties include the timing and amount of the payment, and whether

5

payment resulted from pressure or any unusual activity by the creditor. 5 Collier's on Bankruptcy ¶ 547.04[2][a][B] at 547-60 (Alan N. Resnick & Henry J. Sommers et al. eds., 15th rev. 2008). A payment that is made beyond invoice or contract terms may still be considered in the ordinary course if late payments were the standard course of dealings between the parties. In re Gateway Pacific Corp., 153 F.3d at 917; Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991).

This third element of Section 547(c)(2) requires an objective determination whether payments are ordinary in relation to the standard prevailing in the relevant industry. Peltz v. Merisel Americas, Inc. & MOCA (In re Bridge Information Systems, Inc.), 460 F.3d 1041, 1044 (8th Cir. 2006); In re USA Inns of Eureka Springs, 9 F.3d at 684; 5 Collier's on Bankruptcy ¶ 547.04[2][a][c] (Alan N. Resnick &Henry J. Sommers et al. eds., 15th ed. rev. 2007). See also, Phyllis M. McKenzie, Bankruptcy–Preferential Transfers–Ordinary Course of Business Exception Requires Objective Proof Of Industry Standards. Jones v. United Savings & Loan Ass'n., 17 U. Ark. Little Rock L. J. 817 (1995). The focus should be whether the terms between the parties were particularly unusual in the relevant industry; only dealings so idiosyncratic as to fall outside the prevailing practice among similarly situated members of an industry would be considered extraordinary and fall outside the scope of 547(c)(2)(C). In re U.S.A. Inns of Eureka Springs, Arkansas, Inc., 9 F.3d 680, 685 (8th Cir. 1993).

## ANALYSIS

The Trustee established that Meyer's paid its creditor Interstate $58,296.63 during the 90-day period while Meyer's was insolvent. The transfers enable Interstate to receive more than they would had Meyer's filed a Chapter 7. The Trustee met his burden and proved that the eight transfers are preferential.

The evidence establishes that the eight transfers were for payment of a debt incurred by Meyer's

in the ordinary course of business of both Meyer's and Interstate. Interstate was in the business of selling packaging materials and they sold packaging materials to Meyer's since 1985. Meyer's bought packaging equipment for use in their business. The evidence is uncontroverted on this point. The Trustee even admitted the first element of the ordinary course of business defense. (Tr. at 31.)

The second element requires proof that the transfers were made in the ordinary course of business as between Meyer's and Interstate. The evidence shows the pre-preference period course of business was consistent with the preference period course of business. The average days it took to pay an invoice before the preference period was 70.2 days, compared with 71.5 days during the preference period. There was testimony that the "net 30 days" was only followed if the customer was a cash customer. The evidence establishes net 30 was certainly not the standard course as between Meyer's and Interstate, rather Meyer's typically paid within a 60 to 80 day range. The only invoice paid outside of the 60 to 80 day period during the preference period, was paid 57 days after the invoice date. There was testimony by Mr. Crass that the amount of invoices paid with a single check nearly tripled during the preference period; however, no pressure was received from Interstate, and the time of the year was different which could easily account for this difference. Looking at the eight transfers, the Court finds this difference is not so significant as to take it out of the ordinary course of business as between the parties.

The third element requires Interstate to prove that the payments were made according to ordinary business terms of the industry. There is sufficient evidence to prove that the eight transfers were not unusual for the packaging industry. Mr. Combe, the president of Interstate and previously employed in the packaging industry by a different employer, testified that it is typical in the industry to pay multiple invoices with a single check and to allow more profitable customers to take longer to pay

their invoices. Mr. Meredith, who has worked for eight or nine different packaging companies, testified that customers in the industry rarely pay within 30 days and that it is common to pay 50 to 80 days after receiving invoices. He also testified that it is common within the packaging industry to base payment terms on the size of the customer. Furthermore, he testified that it is common to pay several invoices with one check. Meyer's payments to Interstate fell well within the range of normal business standa rds for the industry.

Mr. Crass' testimony that the industry standard is 36.87 days based on the code of Miscellaneous Nondurable Goods is not persuasive. He is an accountant with no personal experience in the packaging industry and he based his estimate on a code that he isn't even certain is the correct code.

## CONCLUSION

Therefore, for these reasons, Interstate has established the defense of ordinary course of business as provided in 11 U.S.C. § 547(c). It is unnecessary at this time to discuss the other defenses raised by Interstate.

A separate judgment dismissing the Trustee's complaint will be entered pursuant to Federal Rule of Bankruptcy Procedure 9010.

IT IS SO ORDERED.

_____
HON. JAMES G. MIXON
U. S. BANKRUPTCY JUDGE

DATE: 02/02/09

cc: Richard L. Cox, Trustee
Thomas S. Streetman, Esq.
Curtis E. Hogue, Esq.
Paul J. Mooney, Esq.